# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA and
STATE OF MICHIGAN, ex rel.
DETROIT INTEGRITY PARTNERS,

      Plaintiffs,

v.

DETROIT NURSING CENTER, LLC,
MOROUN NURSING CENTER OF
    DETROIT, LLC,
FATHER MURRAY NURSING AND
    REHABILITATION CENTRE, LLC,
PARK NURSING CENTER OF
    TAYLOR, LLC,
COLONIAL HEALTH CARE CENTER, LLC,
WESTLAND NURSING AND
    REHABILITATION CENTRE, LLC,
OLYMPIA GROUP LLC,
VILLA FINANCIAL SERVICES, LLC,
VILLA HEALTHCARE
    MANAGEMENT, INC.,
VILLA OLYMPIA INVESTMENT, LLC,
JONAH BRUCK,
LEONARD WEISS,
BENJAMIN ISRAEL,
TODD STERN, and
MENACHEM "MARK" BERGER,

      Defendants.

_____/

Case No. 19-CV-13046
Hon. Mark A. Goldsmith
Mag. Judge R. Steven Whalen

**MATTER FILED IN
CAMERA AND UNDER
SEAL**

**AMENDED COMPLAINT
AND DEMAND FOR JURY
TRIAL**

COHEN MILSTEIN SELLERS &
TOLL PLLC
Gary L. Azorsky
Casey M. Preston
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(267) 479-5700
gazorsky@cohenmilstein.com
cpreston@cohenmilstein.com

HERTZ SCHRAM PC
Matthew J. Turchyn (P76482)
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
mturchyn@hertzschram.com

*Attorneys for Plaintiff Relator Detroit Integrity Partners*

_____/

## **<u>TABLE OF CONTENTS</u>**

**Page**

I.      INTRODUCTION…………………………………………………….   1

II.     JURISDICTION AND VENUE………………………………………...   5

III.    PARTIES…………………………………………...………………...   6

IV.     STATUTORY AND REGULATORY FRAMEWORK………………..   12

      A.     The Federal False Claims Act and the Michigan Medicaid False
           Claims Act………………………………………………………...   12

      B.     The Medicare and Michigan Medicaid Programs ……....………   15

      C.     Federal and Michigan Requirements Concerning Nursing Home
           Services and Quality of Care ……………………………………   17

      D.     Federal and Michigan Requirements Concerning Nursing
           Facility Staffing……………………………………………………   25

      E.     The Medicare and Michigan Medicaid Payment Systems………..   27

V.      FACTUAL ALLEGATIONS………………………………..…………   34

      A.     The Defendant Facilities' Non-Existent, Grossly Substandard,
           and/or Worthless Services to Residents …....................................   34

      B.     The Defendant Facilities Do Not Employ Enough Nursing
           Personnel to Provide the Services and Care that Michigan and
           the Federal Government Require and Are Paying Them to
           Provide……………………………………………………………   49

      C.     Examples of False Claims………………………………….....   61

VI.     COUNTS………………………………………………..…………   64

1.     Plaintiff Relator Detroit Integrity Partners ("Relator") brings this action on behalf of itself and the United States of America and the State of Michigan against six nursing homes, Detroit Nursing Center, LLC, Moroun Nursing Center of Detroit, LLC, Father Murray Nursing and Rehabilitation Centre, LLC, Park Nursing Center of Taylor, LLC, Colonial Health Care Center, LLC, and Westland Nursing and Rehabilitation Centre, LLC (collectively, the "Defendant Facilities"), and individuals and entities who manage, operate, and control the Defendant Facilities, including Olympia Group LLC, Villa Financial Services, LLC, Villa Healthcare Management, Inc., Villa Olympia Investment, LLC, Jonah Bruck, Leonard Weiss, Benjamin Israel, Todd Stern, and Menachem "Mark" Berger (collectively, the "Defendant Managers"), for violations of the Federal False Claims Act (the "Federal FCA"), 31 U.S.C. §§ 3729 *et seq*., and the Michigan Medicaid False Claims Act (the "Michigan Medicaid FCA"), M.C.L. § 400.601 *et seq*., to recover all damages, civil penalties, and all other recoveries provided for under the Federal FCA and Michigan Medicaid FCA.

## I.
## INTRODUCTION

2.     The elderly, the disabled, the bedridden, individuals with dementia and/or other cognitive or mental health conditions, and individuals recovering from a traumatic injury or illness often require assistance with fundamental daily living activities, such as eating, drinking, toileting, bathing, changing, and oral care, as

1

well as attaining or maintaining their physical, mental, and psychosocial well-being.

3.     Americans understand the significant needs of these vulnerable citizens. It follows that Michigan Medicaid and Medicare (collectively, the "government health care programs") contract with nursing facilities, including the Defendant Facilities, to provide room and board and essential services and care to individuals who are eligible for Medicaid and/or Medicare and who require long-term care.

4.     Under their arrangements with nursing facilities, the government health care programs require that the facilities provide a set bundle of services and care and that they do so in conformity with standards that have been mandated by the State and Federal governments in order to ensure that (a) the services and care are furnished "in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident," and (b) the services and care are provided in a manner that enables residents to "attain or maintain the highest practicable physical, mental and psychosocial well-being." (42 U.S.C. § 1396r(b); 42 C.F.R. § 483.24; Mich. Admin. Code R. 325.20707(1); Mich. Dept. of Health & Human Servs. Medicaid Provider Manual, ch. Nursing Facility, part Nursing Facility Coverages, § 10.21 (Apr. 1, 2019)).

2

5.      To ensure that each Michigan Medicaid and Medicare beneficiary receives the bundle of essential services and care in conformity with the requisite standards, the nursing facilities must maintain an appropriate staff of nurses and nursing assistants (collectively, "nursing personnel").

6.      In return for their promises to provide room and board and the bundle of essential services to Michigan Medicaid and Medicare beneficiaries in conformity with State and Federally mandated standards, Michigan and the United States pay nursing facilities a per diem rate for each Medicaid and Medicare beneficiary.

7.      Nearly all residents of the Defendant Facilities are insured by Michigan Medicaid and/or Medicare. Correspondingly, Michigan and the United States are the primary sources of revenue for the Defendant Facilities, which are privately-owned and for-profit businesses.

8.      Most of the residents at the Defendant Facilities are bed-confined and require assistance with, among other things, repositioning, eating, drinking, toileting, bathing, changing clothes, changing linens, and oral hygiene.

9.      In disregard of their contractual obligations with the government health care programs and residents' well-being, comfort, and health, from at least January 2013 to present, the Defendant Facilities, under the direction and control of the Defendant Managers, have deliberately failed to provide the level and

3

quality of care that they have been promising and claiming to furnish to the vulnerable residents. Indeed, the Defendant Facilities frequently do not provide the residents any of the services for which the government health care programs are paying.

10.     As described in greater detail below, on a regular and systematic basis, the Defendant Facilities, under the direction of the Defendant Managers, have been providing fundamental nursing home services such as body repositioning, nutrition and hydration, toileting, bedding, bathing, care for bedsores (a/k/a decubitus ulcers or pressure ulcers), care for sepsis and other infections, and oral hygiene in a manner that has been so far below the required frequency and quality that the services have been worthless and essentially not provided at all.

11.     Yet the Defendant Facilities, under the Defendant Managers' direction, are falsely representing to the government health care programs that they are providing the required care and services and doing so in conformity with State and Federal law in order to hoodwink the government health care programs into paying them for the unprovided or grossly substandard care and services.

12.     The principal reason for the Defendant Facilities' systematic failures of care is that the nursing homes, as a business strategy orchestrated by the Defendant Managers to reduce costs and increase profits, have been operating with severely understaffed nursing personnel.

13.    In addition to defrauding the government health care programs out of tens of millions of dollars, the Defendant Facilities' staffing deficiencies have caused and continue to cause residents to suffer serious physical and emotional harm, jeopardizing their health, safety, and welfare.

14.    The Relator brings this action to recover on behalf of the State of Michigan and the United States (and the taxpayers), the tens of millions of dollars that the Defendant Facilities and Defendant Managers have fraudulently received from the government health care programs while continuously disregarding the Michigan Medicaid and Medicare beneficiaries' fundamental daily living needs, comfort, well-being, and health.

## II.
## JURISDICTION AND VENUE

15.    Jurisdiction is founded upon the Federal FCA, 31 U.S.C. §§ 3729 *et seq.*, specifically 31 U.S.C. §§ 3732(a) and (b) as well as 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendant Facilities and the Defendant Managers because they transact and conduct business in the Eastern District of Michigan and are engaging in the alleged illegal activities and practices in this District.

16.    The Eastern District of Michigan is an appropriate venue under 31 U.S.C. § 3732(a) because many of the acts complained of took place in this District.

### III.
### PARTIES

17.     The United States is a real party in interest to claims alleged in this

action. The United States administers the Medicare and Medicaid programs

through the Department of Health and Human Services ("HHS") and its operating

division, the Centers for Medicare & Medicaid Services ("CMS").

18.     The State of Michigan is a real party in interest to claims alleged in

this action. Michigan administers its Medicaid program through the Michigan

Department of Health and Human Services ("MDHHS").

19.     Plaintiff relator Detroit Integrity Partners ("Relator") is a Delaware

general partnership. Relator brings this action on behalf of the United States and

the Michigan. Pursuant to Section 15-201(a) of the Delaware Revised Uniform

Partnership Act, Detroit Integrity Partners is not distinct from its partners.

20.     Defendant Detroit Nursing Center, LLC (d/b/a Imperial, A Villa

Center; formerly d/b/a Imperial Nursing and Rehabilitation Centre and as Imperial

Healthcare Centre) ("Imperial"), is a Michigan limited liability company that is

managed, operated, and controlled by the Defendant Managers. Imperial is a long-

term care facility with a skilled nursing unit, a rehabilitation unit, and a dementia

unit and is located in Dearborn Heights, Michigan. The nursing facility has a total

of 265 beds and typically operates at or near full capacity.[1] At all times relevant to

this action, Imperial has participated in the Michigan Medicaid and Medicare

programs.

21.     Defendant Moroun Nursing Center of Detroit, LLC (d/b/a

Ambassador, A Villa Center; formerly d/b/a Ambassador Nursing & Rehabilitation

Center) ("Ambassador") is a Michigan limited liability company that is managed,

operated, and controlled by the Defendant Managers. Ambassador is a nursing

home located in Detroit, Michigan. The nursing facility has a total of 176 beds. At

all times relevant to this action, Ambassador has participated in the Michigan

Medicaid and Medicare programs.

22.     Defendant Father Murray Nursing and Rehabilitation Centre, LLC

(d/b/a Father Murray, A Villa Center) ("Father Murray") is a Michigan limited

liability company that is managed, operated, and controlled by the Defendant

Managers. Father Murray is a nursing home located in Center Line, Michigan. The

nursing facility has a total of 231 beds. At all times relevant to this action, Father

Murray has participated in the Michigan Medicaid and Medicare programs.

---

[1]  Imperial is divided into four units: Unit A houses short term rehabilitation and
skilled nursing residents and has 64 beds; Unit B houses dementia care residents
and has 63 beds; and Units C and D house the long-term care residents and have 75
and 63 beds, respectively.

23.     Defendant Park Nursing Center of Taylor, LLC (d/b/a Regency, A Villa Center; formerly d/b/a Regency Nursing and Rehabilitation Centre) ("Regency") is a Michigan limited liability company that is managed, operated, and controlled by the Defendant Managers. Regency is a nursing home located in Taylor, Michigan. The nursing facility has a total of 244 beds. At all times relevant to this action, Regency has participated in the Michigan Medicaid and Medicare programs.

24.     Defendant Colonial Health Care Center, LLC (d/b/a St. Joseph's Healthcare Center; previously d/b/a St. Joseph's Nursing and Rehabilitation Centre) ("St. Joseph's") is a Michigan limited liability company that is managed, operated, and controlled by the Defendant Managers. St. Joseph's is a nursing home located in Hamtramck, Michigan. The nursing facility has a total of 169 beds. At all times relevant to this action, St. Joseph's has participated in the Michigan Medicaid and Medicare programs.

25.     Defendant Westland Nursing and Rehabilitation Centre, LLC (d/b/a Westland Convalescent & Rehab Center and Westland Nursing and Rehabilitation Centre) ("Westland") is a Michigan limited liability company that is managed, operated, and controlled by the Defendant Managers. Westland is a nursing home located in Warren, Michigan. The nursing facility has a total of 230 beds. At all

times relevant to this action, Westland has participated in the Michigan Medicaid and Medicare programs.

26.     As stated above, Detroit Nursing Center, LLC, Moroun Nursing Center of Detroit, LLC, Father Murray Nursing and Rehabilitation Centre, LLC, Park Nursing Center of Taylor, LLC, Colonial Health Care Center, LLC, and Westland Nursing and Rehabilitation Centre, LLC, are collectively referred to herein as the "Defendant Facilities."

27.     Defendant Olympia Group LLC ("Olympia"), an Illinois limited liability company, maintains its principal office in Lincolnwood, Illinois. At all times relevant to this action, Olympia has managed and operated the Defendant Facilities.

28.     Defendant Villa Financial Services, LLC ("Villa Financial"), an Illinois limited liability company, maintains its principal office in Lincolnwood, Illinois. Villa Financial is managed and controlled by defendants Menachem "Mark" Berger, Benjamin Israel, and Todd Stern. Villa Financial manages long-term care/nursing home providers located in Michigan, Illinois, Wisconsin, Ohio, and Minnesota. Starting in August 2018, Villa Financial entered into an arrangement with Olympia under which it agreed to provide management and business support services to the Defendant Facilities.

29.     Defendant Villa Healthcare Management, Inc. (d/b/a Villa Healthcare) ("Villa Healthcare"), an Illinois corporation, maintains its principal office in Skokie, Illinois. Villa Healthcare is managed and controlled by defendants Benjamin Israel and Todd Stern. Villa Healthcare manages long-term care/nursing home providers located in Michigan, Illinois, Wisconsin, Ohio, and Minnesota. Starting in August 2018, Villa Healthcare entered into an arrangement with Olympia under which it agreed to provide management and business support services to the Defendant Facilities.

30.     Defendant Villa Olympia Investment, LLC ("VOI"), an Illinois limited liability company, maintains its principal office in Skokie, Illinois. VOI is managed and controlled by defendants Benjamin Israel, Todd Stern, Jonah Bruck, Leonard Weiss, and Menachem "Mark" Berger. Since August 2018, VOI has been providing management services to and has held an ownership interest in defendants Imperial, Regency, Father Murray, and Ambassador.

31.     Defendant Jonah Bruck, an Illinois resident, has served as Olympia's Chief Executive Officer since 1997. Mr. Bruck, with Mr. Weiss, founded Olympia in or around 1997 and holds a substantial ownership interest in Olympia. Mr. Bruck also owns, directly or through trusts, an interest in each of the Defendant

10

Facilities.[2] In addition, Mr. Bruck serves or served as an officer of each of the Defendant Facilities. According to Mr. Bruck's profile on LinkedIn.com, "[he] was key in handling all the operations at Olympia Group and was constantly seeking further opportunities to grow the business." (Jonah Bruck, LinkedIn, https://www.linkedin.com/in/jonahbruck/ (last viewed Oct. 11, 2019)).

32.    Defendant Leonard "Lennie" Weiss, an Illinois resident, has served as an officer of Olympia since 1997. Mr. Weiss, with Mr. Bruck, founded Olympia in or around 1997 and holds a substantial ownership interest in Olympia. Mr. Weiss also owns, directly or through trusts, an interest in each of the Defendant Facilities. According to Olympia's website, Mr. Weiss "oversees and handles all the financing, revenue and financials of Olympia Group." (Our Team, Olympia Group, https://www.olympiagroupllc.com/our-team (last viewed on Oct. 11, 2019)).

33.    Defendant Benjamin Israel, an Illinois resident, has served as the President of Villa Healthcare since at least 2012 and is a managing member of Villa Financial. Mr. Israel owns an interest in VOI and is a manager of VOI. Mr. Israel has been an officer of the Defendant Facilities since August 2018. In addition, Mr. Israel also owns, directly or through trusts, an interest in each of the Defendant Facilities.

---

[2]  In or around August 2018, Mr. Bruck sold or transferred portions of his ownership interests in the Defendant Facilities to defendants VOI, Villa Healthcare, Mr. Israel, and/or Mr. Stern.

11

34.     Defendant Todd Stern, an Illinois resident, serves as the Secretary of Villa Healthcare and is a managing member of Villa Financial. Mr. Stern has been an officer of the Defendant Facilities since August 2018. In addition, he owns, directly or through trusts, an interest in each of the Defendant Facilities.

35.     Defendant Menachem "Mark" Berger, an Illinois resident, is a managing member of Villa Financial, serving as its Chief Executive Officer since at least 2013. Mr. Berger owns an interest in VOI and is a manager of VOI.

36.     As stated above, defendants Olympia, Villa Financial, Villa Healthcare, VOI, Jonah Bruck, Leonard Weiss, Benjamin Israel, Todd Stern, and Menachem "Mark" Berger are collectively referred to herein as the "Defendant Managers."

37.     On information and belief, Olympia, Villa Financial, Villa Healthcare, VOI, Messrs. Bruck, Weiss, Israel, Stern, and Berger own and operate numerous other entities that serve as operating companies, property ownership companies, or management and support companies for the Defendant Facilities.

## IV.
## STATUTORY AND REGULATORY FRAMEWORK

**A.     The Federal False Claims Act and the Michigan Medicaid False Claims Act**

### *Federal False Claims Act*

38.     The Federal FCA imposes liability on:

[A]ny person who—

(A)     knowingly presents, or causes to be presented, a false or
        fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false
        record or statement material to a false or fraudulent claim[.]

(31 U.S.C. §§ 3729(a)(1)(A) and (B)).

39.     The term "knowingly" means "that a person, with respect to

information (1) has actual knowledge of the information; (2) acts in deliberate

ignorance of the truth or falsity of the information; or (3) acts in reckless disregard

of the truth or falsity of the information." (31 U.S.C. § 3729(b)(1)(A)). Proof of

specific intent to defraud is not required. (*See* 31 U.S.C. § 3729(b)(1)(B)).

40.     Section 3729(a)(1) of the Federal FCA provides that a person is liable

to the United States government for three times the amount of damages that the

government sustains because of the act of that person plus a civil penalty of

$5,000–$10,000 per violation. Pursuant to the Federal Civil Penalties Inflation

Adjustment Act of 1990 (Pub. L. 101-410), as amended by the Debt Collection

Improvement Act of 1996 (Pub. L. 104-134) and the Federal Civil Penalties

Inflation Adjustment Act of 2015 (Pub. L. 114-74), the Federal FCA's penalty

range is periodically adjusted for inflation. For Federal FCA violations that

occurred on or before November 2, 2015, the penalty range is $5,500–$11,000 per

violation. And for Federal FCA violations that occurred after November 2, 2015,

the penalty range is presently $11,181–$22,363 per violation. (*See* 28 C.F.R. §§

85.3 and 85.5 (2018)).

### *Michigan Medicaid False Claims Act*

41.    The Michigan Medicaid FCA makes it unlawful for a "person" to:

- "make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act … knowing the claim to be false" (M.C.L. § 400.607(1)); or

- "knowingly and wilfully make, or induce or seek to induce the making of, a false statement or false representation of a material fact with respect to the conditions or operation of an institution or facility in order that the institution or facility may qualify, upon initial certification or upon recertification, as a … skilled nursing facility, intermediate care facility …" (M.C.L. § 400.605(1)).[3]

42.    The term "knowing" and "knowingly" means that "a person is in

possession of facts under which he or she is aware or should be aware of the nature

of his or her conduct and that his or her conduct is substantially certain to cause the

payment of a Medicaid benefit." (M.C.L. § 400.602(f)). Additionally, "knowing"

and "knowingly" include acting in deliberate ignorance of the truth or falsity of

facts or acting in reckless disregard of the truth or falsity of facts." (*Id.*). Proof of

specific intent to defraud is not required. (*See id.*).

---

[3]  The term "intermediate care facility" includes a nursing home or other nursing care facility, or distinct part thereof, that provides intermediate care or basic care that is less than skilled nursing care. (*See* M.C.L. § 333.20108(1)). A "skilled nursing facility" includes a nursing home or other nursing care facility, or a distinct part thereof, that provides skilled nursing care. (*See* M.C.L. § 333.20109(4)).

43.     In addition to repaying the State the full amount it received in connection with a false claim, a person who violates the Michigan Medicaid FCA is also liable for triple the amount of damages suffered by the State as a result of the person's conduct as well as a civil penalty of not less than $5,000 or more than $10,000 for each false claim submitted. (*See* M.C.L. § 400.612(1)).

**B.      The Medicare and Michigan Medicaid Programs**

### ***Medicare***

44.     The United States, through HHS and CMS, administers the Medicare program primarily for persons 65 and older and the disabled. The Medicare program was established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*

45.     The Medicare program is divided into "parts" that cover different services. Medicare Part A generally covers inpatient hospital services and services for patients with end-stage renal disease (ESRD). Medicare Part B generally covers outpatient physician services, including prescription drugs administered "incident to" physician services. Medicare Part C provides for private companies to offer "Medicare Advantage" plans that include, at a minimum, all benefits covered by Parts A and B. Medicare pays a fixed monthly amount per beneficiary to the private companies that offer Medicare Advantage plans.

46.     It is the obligation of every health care provider that seeks payment from Medicare to assure that services it provides "(1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities." (42 U.S.C. § 1320c-5(a)).

### *Michigan Medicaid*

47.     Medicaid is a joint Federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. Each state, including Michigan, administers a state Medicaid program. The Federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. (*See* 42 U.S.C. §§ 1396, 1396a(a)(13) & (a)(30)(A)).

48.     Providers participating in Michigan Medicaid submit claims for services rendered to Medicaid beneficiaries to Michigan Medicaid for payment.

49.     Michigan Medicaid directly pays providers for reimbursable items and services, obtaining the Federal share of the payment from accounts that draw on the United States Treasury. (*See* 42 C.F.R. §§ 430.0 *et seq*.). During the relevant

16

period, the Federal government has paid between 64.4% and 66.4% of Michigan Medicaid's expenditures.

**C.    Federal and Michigan Requirements Concerning Nursing Home Services and Quality of Care**

### *Federal Requirements*

50.    In 1987, Congress enacted the Nursing Home Reform Act (the "NHRA"), 42 U.S.C. §§ 1395i-3 and 1396r *et seq*., which became effective on October 1, 1990. The NHRA requires that nursing facilities operate and provide services and care in compliance with (a) all applicable Federal and state laws and regulations governing the provision of services and care to residents and (b) accepted professional standards and principles applicable to professionals providing services and care at nursing facilities. (*See* 42 U.S.C. § 1396r(d)(4)(A); 42 C.F.R. § 483.70(b)).

51.    The NHRA defines a "nursing facility" as an institution, or part of an institution, that is "primarily engaged" in providing the following services to residents:

(A)  skilled nursing care and related services for residents who require medical or nursing care,

(B)  rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

(C)  on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care

17

and services (above the level of room and board) which can be made available to them only through institutional facilities,

and is not primarily for the care and treatment of mental diseases[.]

(42 U.S.C. § 1396r(a)).

52.     Under the NHRA, nursing facilities must furnish care to residents "in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." (42 U.S.C. § 1396r(b)(1)(A)).

53.     The NHRA requires that nursing facilities conduct "a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity" and create a written plan of care for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met." (42 U.S.C. §§ 1396r(b)(2) & (3); 42 C.F.R. §§ 483.20 & 483.21).

54.     Nursing facilities must then provide services that will enable each resident to "attain or maintain the highest practicable physical, mental and psychosocial well-being … in accordance with [the resident's] plan of care." (42 U.S.C. § 1396r(b)(2); accord 42 C.F.R. § 483.24).

55.     To the extent needed to fulfill residents' plans of care, the NHRA requires that nursing facilities provide, or arrange for the provision of, the following services, among others:

- "nursing and related services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident";

18

- "dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident";

- "routine dental services (to the extent covered under the State plan) and emergency dental services to meet the needs of each resident"; and

- "treatment and services required by mentally ill and mentally retarded residents not otherwise provided or arranged for (or required to be provided or arranged for) by the State."

(42 U.S.C. § 1396r(b)(4)(A)).

56.    Under HHS regulations, nursing facilities must ensure that residents who are unable to carry out activities of daily living receive care and services for the following fundamental daily living activities:

(1)   Hygiene - bathing, dressing, grooming, and oral care;

(2)   Mobility - transfer and ambulation, including walking;

(3)   Elimination - toileting;

(4)   Dining - eating, including meals and snacks; and

(5)   Communication, including (i) speech, (ii) language, (iii) other functional communication systems.

(42 C.F.R. § 483.24(b)).

57.    Nursing facilities, pursuant to HHS regulations, must also "ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices," including, among others, the following care related to pressure ulcers and assisted nutrition and hydration:

19

    (b)(1) Pressure ulcers. Based on the comprehensive assessment of a resident, the facility must ensure that—

        (i)    A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and

        (ii)   A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

                       \* \* \*

    (g)   Assisted nutrition and hydration. (Includes naso-gastric and gastrostomy tubes, both percutaneous endoscopic gastrostomy and percutaneous endoscopic jejunostomy, and enteral fluids). Based on a resident's comprehensive assessment, the facility must ensure that a resident—

        (1)   Maintains acceptable parameters of nutritional status, such as usual body weight or desirable body weight range and electrolyte balance, unless the resident's clinical condition demonstrates that this is not possible or resident preferences indicate otherwise;

        (2)   Is offered sufficient fluid intake to maintain proper hydration and health; [and]

        (3)   Is offered a therapeutic diet when there is a nutritional problem and the health care provider orders a therapeutic diet[.]

(42 C.F.R. § 483.25).

     58.    Additionally, HHS has issued a regulation that requires nursing facilities to provide residents with "a safe, clean, comfortable, and homelike

environment," including, but not limited to, a "clean bed and bath linens that are in good condition." (42 C.F.R. § 483.10(i)).

### *State of Michigan Requirements*

59.     Under Michigan law, a "nursing home" is a "nursing care facility … that provides organized nursing care and medical treatment to 7 or more unrelated individuals suffering or recovering from illness, injury, or infirmity." (M.C.L. § 333.20109(1); Mich. Admin. Code R. 325.20103).

60.     Nursing facilities licensed by the State of Michigan must comply with all applicable Michigan and Federal laws. (*See* Mich. Admin. Code R. 325.20109).

61.     Under Michigan law, the owner, operator, and governing body of a licensed nursing home, including the Defendant Managers, are "responsible for all phases of the operation of the nursing home and quality of care rendered in the home." (M.C.L. § 333.21713).

62.     Similar to the Federal government, Michigan requires that nursing facilities ensure that residents "receive preventive, supportive, maintenance, habilitative, and rehabilitative nursing care directed to the physiologic and psychosocial needs and well-being of that patient." (Mich. Admin. Code R. 325.20707(1)).

63.     Correspondingly, "nursing facilities must have nursing staff sufficient to provide nursing and other related services to attain or maintain the highest

practicable physical, mental, and psychological well-being of each resident." (*See* MDHHS Medicaid Provider Manual, ch. Nursing Facility, part Nursing Facility Coverages, § 10.21 (Apr. 1, 2019)).

64.    To be eligible for licensure and payment for furnishing nursing home services to residents insured by the government health care programs nursing facilities must provide residents the following bundle of services and supplies:

- Administrative Services
- Admission Kits (Limited to routine personal hygiene items)
- Daily Oral Hygiene and Supplies
- Dietary Services and Food (including enteral tube feeding formula, supplies and equipment)
- Durable Medical Equipment - standard equipment
- End of Life Care
- Enrichment Programs
- Food
- Foot Care - Routine
- Hospice Services - Nursing Facility Responsibility
- Housekeeping and Maintenance
- Intravenous Therapy - nursing supplies, equipment (including all pumps)
- Laboratory Services - routine
- Laundry Services
- Medically-Related Social Services
- Medication Reviews
- Mental Health Services - facility provided
- Nurse Aide Attendance for Medical Appointments
- Nursing Care - routine
- Oxygen - intermittent and infrequent
- Personal Hygiene Items
- Pharmacy - Routine Over-the-Counter Drugs
- Private Room (if medically necessary)
- Supplies and Accessories

- Therapies - Routine maintenance
- Transportation Services - non-emergency
- Vaccines
- Wound Dressings

(*See* MDHHS Medicaid Provider Manual, ch. Nursing Facility, part Nursing

Facility Coverages, § 10 (Apr. 1, 2019)).

65.     Further, residents of nursing facilities in Michigan are legally entitled

to the following care and services, among others, that are deemed to be essential to

their well-being:

(a)   Care of the skin, mouth, teeth, hands, and feet and shampooing and grooming of the hair.

(b)   Oral hygiene shall be provided at least daily and more often as required. Special mouth care shall be regularly provided to the acutely ill patient in accordance with individual need or as ordered by the physician.

(c)   A patient's hair shall be combed or brushed daily. A patient's hair shall be shampooed on a routine basis at least weekly and more often as required, unless the attending physician writes an order to the contrary.

* * *

(e)   A complete tub or shower bath shall be taken, under staff supervision, by, or administered to, an ambulatory patient at least once a week, unless the physician writes an order to the contrary.

(f)   A bedfast patient shall be assisted with bathing or bathed completely at least twice a week and shall be partially bathed daily and as required due to secretions, excretions, or odors.

(g)   A patient shall be provided the opportunity for, and, as necessary, assisted with, personal care, including toileting, oral hygiene, and washing of hands and face before the breakfast meal. …

23

(h)   A patient's clothing or bedding shall be changed promptly when it becomes wet or soiled.

(i)   A patient shall receive skin care as required according to written procedures to prevent dryness, irritation, itching, or decubitus.

(j)   A patient shall receive care as required according to written procedures to prevent complications of inactivity or prolonged periods of being bedfast.

(k)   An inactive or bedfast patient shall be positioned according to written procedures so that major body parts are in natural alignment. Such position shall be changed appropriately at regular and specified intervals. Supportive devices shall be employed as indicated to maintain posture, support weakened body parts, or relieve undue pressure.

(Mich. Admin. Code R. 325.20707(4)).

66.   Michigan also requires that each resident be provided a bed and mattress that is in good condition, with a nonabsorbent cover. (*See* Mich. Admin. Code R. 325.20711(1)(a)). And each bed must be maintained as follows:

(a)   Covered with a mattress pad;

(b)   Made daily with clean linen in good repair; and

(c)   Changed immediately when soiled and at least twice weekly for bedfast patients and once weekly for ambulatory patients.

(Mich. Admin. Code R. 325.20711(3)).

67.   Under Mich. Admin. Code R. 325.20803(1), nursing facilities must ensure that residents' food and nutritional needs are met and conform to accepted standards of practice. Nursing facilities must serve at least three meals or their

24

equivalent daily, with not more than a 14-hour span between a substantial evening meal and breakfast. (*See* Mich. Admin. Code R. 325.20803(2)). When required, supplementary fluids and special nourishments must be provided. (*See* Mich. Admin. Code R. 325.20803(4)).

## D.   Federal and Michigan Requirements Concerning Nursing Facility Staffing

### *Federal Requirements*

68.   The NHRA requires that nursing homes have sufficient staff to meet the needs of all residents, have a director of nursing ("DON") who is on duty for eight hours per day, seven days per week, and have at least one licensed nurse— either a registered nurse ("RN") or licensed practical nurse ("LPN")—on duty at all times. (*See* 42 U.S.C. § 1396r(b)(4)(C); 42 C.F.R. §§ 483.35(a) and (b)).

69.   Under HHS regulations, nursing facilities must maintain "sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population …" (42 C.F.R. § 483.35).

### *State of Michigan Requirements*

70.   To ensure that residents receive Federally- and State-required nursing

facility services and care, Michigan has codified specific staffing requirements. A

nursing facility must employ nursing personnel[4] sufficient to:

(a)  provide continuous 24-hour nursing care;

(b)  have one or more licensed nurses (RNs and/or LPNs) on duty at all
times;

(c)  provide services to meet the needs of all residents;

(d)  provide at least 2 hours and 15 minutes of nursing care to each patient
per day; and

(e)  throughout each respective shift, satisfy the following patient to nursing
care personnel ratios:

| Shift | Required Ratio of Patients to Nursing Care Personnel (excluding the DON) |
|---|---|
| Morning | Not more than 8 patients to 1 nursing care personnel |
| Afternoon | Not more than 12 patients to 1 nursing care personnel |
| Nighttime | Not more than 15 patients to 1 nursing care personnel |

(*See* M.C.L. § 333.21720a(1) & (2); Mich. Admin. Code R. 325.20703(7)).

71.  Like Federal law, Michigan law requires that nursing facilities employ

a DON, who is a registered nurse, to supervise its nursing personnel. (*See* M.C.L. §

333.21720a(1); Mich. Admin. Code R. 325.20701(1)).

72.  Nursing homes operating in Michigan are required to submit nurse

staffing reports to MDHHS at least quarterly. (*See* Mich. Admin. Code R.

---

[4]  Patient care provided by RNs, LPNs, nurse assistants, and orderlies count in
meeting nurse staffing requirements. (*See* Mich. Admin. Code r 325.20704(3)). In
nursing homes with 30 or more beds, the DON does not count for purposes of
meeting the minimum ratios of nursing personnel. (*See* M.C.L. § 333.21720a(2)).

325.20704(2)). In submitting the nurse staffing reports, the nursing facility's administrator certifies that the contents of the report are accurate. (*See* Mich. Admin. Code R. 325.20704(5)).

73.     If MDHHS determines that a nursing home has violated the nurse staffing requirements set forth in M.C.L. § 333.21720a, it is authorized to commence an action to suspend or revoke the nursing facility's license. (*See* Mich. Admin. Code R. 325.20705).

**E.     The Medicare and Michigan Medicaid Payment Systems**

74.     The Medicare and Michigan Medicaid programs pay nursing facilities, including the Defendant Facilities, to provide residents who are insured by the government health care programs a bundle of nursing home services, including all of those mentioned in Part IV.C. above. Medicare and Michigan Medicaid compensate nursing facilities a per diem amount for each day that they provide the required nursing home services and care to residents.

75.     As Medicare and Michigan Medicaid providers, nursing facilities must comply with the statutes and regulations that govern the services provided to residents insured by Medicare and/or Michigan Medicaid.

76.     The government health care programs will only pay nursing facilities for services when such services are "of a quality which meets professionally recognized standards of health care." (42 U.S.C. § 1320c-5(a)(2)).

77.     In order to participate in the government health care programs and receive payments for providing nursing home services and care to residents insured by Medicare and/or Michigan Medicaid, the Defendant Facilities were obligated to enter into agreements and execute forms, including those referenced below, in which the Defendant Facilities made express representations and certifications regarding their present and future compliance with applicable Federal and Michigan statutes and regulations. And as the managers and operators of the Defendant Facilities, the Defendant Managers caused the Defendant Facilities to enter into the agreements and submit the forms and make the express representations and certifications contained therein.

78.     **Michigan Medicaid Provider Enrollment Forms:** The Defendant Facilities entered into provider agreements with Michigan Medicaid in which, on information and belief, they provided a certification that was similar to the certification they made to Medicare discussed below.[5]

79.     **Medicare Provider Agreements:** The Defendant Facilities entered into provider agreements with Medicare in which they made the following certification:

> I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare ... may be punishable by criminal, civil or administrative penalties

---

[5]  This form is only accessible to providers.

including, but not limited to, the denial or revocation of Medicare
billing privileges, and/or the imposition of fines, civil damages, and/or
imprisonment.

80.    **Michigan Medicaid Community Health Automated Medicaid**

**Processing System Enrollment Forms:** All providers who render services to

Michigan Medicaid beneficiaries are required to be screened and enrolled in the

Community Health Automated Medicaid Processing System (CHAMPS).

Accordingly, the Defendant Facilities executed CHAMPS enrollment Forms. By

executing the CHAMPS Enrollment Forms, the Defendant Facilities, on

information and belief, provided a certification similar to the certification that they

provided to Medicare in the Electronic Data Interchange enrollment form

discussed below.

81.    **Electronic Data Interchange Enrollment Forms:** In order to be able

to bill Medicare for services electronically, the Defendant Facilities executed

Electronic Data Interchange ("EDI") enrollment form. By executing the EDI

enrollment form, the Defendant Facilities agreed to:

- "be responsible for all Medicare claims submitted to CMS by
  itself, its employees, or its agents"; and

- "submit claims that are accurate, complete, and truthful[.]"

In executing the EDI enrollment form, the Defendant Facilities also acknowledged

that:

[A]ll claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law.

82.     **Claim Forms:** The Defendant Facilities submitted claims for payment to Medicare and Michigan Medicaid electronically and on paper using CMS Form UB-04 (CMS-1450). In submitting each claim for payment, the Defendant Facilities expressly certified that:

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

\*\*\*

The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

83.     As set forth in the Michigan Medicaid Manual, "[p]roviders certify by signature that a claim is true, accurate, and contains no false or erroneous information." (MDHHS Medicaid Provider Manual, ch. General Information for Providers, § 12.8 (Apr. 1, 2019)). Moreover, when a provider endorses or deposits the check (or warrant) it received from Michigan Medicaid for services, it certifies that the services billed were actually provided and that the claims paid by the check accurately document that the health care services provided were furnished in

30

compliance with the requirements of the provider's contract with Medicaid. (*See id.*).

84.    **Medicaid Annual Cost Reports:** Each year the Defendant Facilities submitted an annual cost report to MDHHS in which either an officer or the administrator certified:

> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying Claim/Cost Report and supporting schedule prepared by _____ and that to the best of my knowledge and belief, it is a true correct and complete statement prepared from the books and records of the provider(s) in accordance with applicable instructions except as noted.
>
> I have read this Claim/Cost Report and hereby certify to the best of my knowledge and belief that this Claim/Cost Report is true, accurate, prepared with knowledge and consent of the undersigned and does not contain untrue, misleading or deceptive information, under penalty of perjury. I also certify that all expenses presented in this Claim/Cost Report as a basis for securing reimbursement for Title XIX patients, were incurred to provide patient care in this facility. All supporting records for the expenses recorded have been retained as required by state law and will be made available to auditors upon request.

(Form MSA-1579). The Defendant Facilities also acknowledged that:

> Misrepresentation or falsification of any information contained in this report may be punishable by fine and/or imprisonment under state or federal law.

(*Id.*). The per diem rate that Michigan Medicaid pays nursing facilities is prospectively determined based on each nursing facility's reported acquisition costs.

31

85.   **Medicare Annual Cost Reports:** Each year the Defendant Facilities submitted an annual cost report to CMS in which a responsible official from each facility certified:

> I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

(Form CMS-2540-10). In submitting the annual costs reports, the Defendant Facilities acknowledged that:

> [M]isrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law.

(*Id.*).

86.   **Health Insurance Benefit Agreement:** The Defendant Facilities executed a Health Insurance Benefit Agreement (CMS-1561) and by doing so expressly agreed to conform to the provisions of section 1866 of the Social Security Act (42 U.S.C. § 1395cc) and the applicable regulations within Title 42 of the Code of Federal Regulations, including the standard of care regulations (42 C.F.R. §§ 483 *et seq*.) that implement the NHRA, 42 U.S.C. §§ 1395i-3 and 1396r *et seq*.

87.   **Minimum Data Set Forms:** The Defendant facilities submitted Minimum Data Set ("MDS") forms to CMS for each resident upon the resident's admission and then quarterly thereafter. (*See* 42 C.F.R. § 483.315). In the MDS

32

forms, the Defendant Facilities were required to provide CMS with an accurate and comprehensive assessment of each resident's functional capabilities, identify health problems, and formulate a resident's individual plan of care. Based on his or her medical condition, nursing care needs, and other factors stated in the form, each resident was assigned to a specific Resource Utilization Group ("RUG"). CMS then relied on the accuracy of the MDS forms in determining the per diem rate for each nursing facility resident covered by Medicare Part A. In each MDS form submitted to CMS the Defendant Facilities provided the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.

Moreover, in each MDS form submitted, the Defendant Facilities also acknowledged that:

- "I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."

- "I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information."

33

## V.
## FACTUAL ALLEGATIONS

**A.    The Defendant Facilities' Non-Existent, Grossly Substandard, and/or Worthless Services to Residents**

88.    Each of the Defendant Facilities purports to provide required nursing home services and care to beneficiaries of the Michigan Medicaid and Medicare programs and regularly submits bills for the required services and care and receives payments from the government health care programs for such services. In fact, the vast majority of the residents at the Defendant Facilities are insured by Michigan Medicaid and/or Medicare, and, correspondingly, the government health care programs are the main source of the Defendant Facilities' revenues.

89.    In order to participate in the government health care programs and to obtain payment for the nursing home care and services that they furnish to beneficiaries of the government health care programs, the Defendant Facilities are required to provide a set bundle of services and care to each resident that ensures that the resident "attain[s] or maintain[s] the highest practicable level of physical, mental, and psychosocial well-being …" (42 U.S.C. § 1396r(b)(2); accord Mich. Admin. Code R. 325.20707(1)).

90.    From at least January 2013 to present, the Defendant Facilities, under the direction and control of the Defendant Managers, deliberately failed to provide the level and quality of care mandated by law and that they have been promising

34

and claiming to furnish to their vulnerable residents. Crucially, the Defendant Facilities frequently do not provide the residents any of the services for which the government health care programs are paying. On a regular and systematic basis, the Defendant Facilities, under the direction of the Defendant Managers, have been providing fundamental nursing home services such as body repositioning, nutrition and hydration, toileting, bedding, bathing, care for bedsores (a/k/a decubitus ulcers or pressure ulcers), care for sepsis and other infections, and oral hygiene in a manner that has been so far below the required frequency and quality that the services have been worthless and essentially tantamount to receiving no services at all.

91.     Starting in August 2018 and continuing through the present, Villa Financial, Villa Healthcare, VOI, and Messrs. Israel, Stern, and Berger have been managing the Defendant Facilities with Olympia and Messrs. Bruck and Weiss and likewise have been causing the Defendant Facilities to disregard residents' well-being and violate Michigan and Federal law by regularly and systematically depriving residents of required nursing home services and care and furnishing other services and care in a manner that is so far below required standards that the services and care are essentially worthless.

92.     By regularly depriving residents of services and care and regularly providing grossly substandard services and care, the Defendant Facilities, under

the direction and control of the Defendant Managers, have been eroding residents'
physical, mental, and psychosocial well-being and, indeed, have caused and
continue to cause serious bodily and emotional harm and injury to residents,
increasing their rate of morbidity and/or hastening their deaths.

93.    Because they are not receiving necessary services and care that the
government health care programs require (and are paying the Defendant Facilities
to provide), residents are often subjected to multiple forms of discomfort and pain
for extended periods or permanently.

94.    Nursing personnel who have become accustomed to the inhumane
environment inside the Defendant Facilities often tune out residents' constant cries
for help and the regular yelling and groaning about their pain and discomfort.

95.    Yet the Defendant Facilities have been fraudulently requesting and
obtaining payment from the government health care programs for the non-existent
services and care as well as the grossly substandard services and care that they
have been systematically providing to hundreds of Michigan Medicaid and
Medicare beneficiaries on a daily basis for more than six years.

96.    The principal reason for the systemic failures of care during the
relevant period is that the Defendant Facilities, under the management and control
of the Defendant Managers, have been regularly operating with severely
understaffed nursing personnel. The care teams utilized by the Defendant Facilities

lack sufficient nurses and nursing assistants to provide the residents with the services and care that they need in violation of Michigan and Federal law. The grossly inadequate staffing levels at the Defendant Facilities are described in greater detail in Part V.B. below.

97.     Examples of fundamental nursing home care and services that, on a regular and systematic basis, either are not provided to residents of the Defendant Facilities at all or are furnished at a frequency or quality level that is far below accepted standards include, but are not limited to: body repositioning; nutrition/hydration; toileting; bedding; bathing; treatment of bedsores (a/k/a decubitus ulcers or pressure ulcers); treatment of sepsis; and dental hygiene.

### *Body Repositioning*

98.     Immobility is a significant risk factor affecting both the development and healing of bedsores. As a result, bedridden residents must be repositioned on a regular basis throughout the day to reduce or relieve the pressure on areas of bony prominence. Additionally, repositioning helps residents maintain muscle mass and general tissue strength and ensures proper blood flow throughout their bodies. It follows that Michigan and the Federal government require that nursing facilities reposition residents at regular and specified intervals throughout the day. (*See* Mich. Admin. Code R. 325.20707(4); 42 C.F.R. § 483.25).

99.     In accordance with the accepted standard of care for residents at risk for bedsores, the Defendant Facilities have a written policy stating that bedfast residents should be repositioned at least every two hours. Repositioning residents is a responsibility that nursing homes typically assign to nursing assistants.

100.     Many of the residents at the Defendant Facilities are bedridden. For instance, on June 25, 2019, Imperial had 231 residents; 31% of these residents were bed confined. Inasmuch as the Defendant Facilities, under the direction of the Defendant Managers, have not been employing enough nursing assistants to adequately provide for residents' needs, many of the bedridden residents at the nursing homes are not repositioned every two hours. In fact, it is common for residents to be repositioned only once per day, rather than 12 times per day. Because the Defendant Facilities have not been providing this essential service, residents commonly develop bedsores. Moreover, because residents are only repositioned occasionally, once a resident develops a bedsore, the bedsore usually does not heal and indeed worsens, exposing the resident to increased pain and susceptibility to harmful infections.

### *Nutrition/Hydration*

101.     As discussed above, Michigan and the Federal government have enacted laws mandating that nursing homes ensure residents' nutritional and hydration needs are met. (*See* 42 U.S.C. § 1396r(b)(4)(A); 42 C.F.R. §§

483.24(b)(4) & 483.25(g); Mich. Admin Code R. 325.20803). In addition, a

significant percentage of nursing home residents require assistance eating and

drinking. Here again, the responsibility for assisting nursing home residents who

need help eating and drinking is typically delegated to nursing assistants.

102.   Since at least January 2013, the Defendant Facilities, under the

direction and control of the Defendant Managers, have failed to employ sufficient

nursing personnel to ensure that residents, on a regular basis, receive the level of

nourishment and hydration that they require. Meals for these weak, dependent, and

often voiceless residents are frequently delayed, not provided at all, or rushed and

incomplete because the overburdened nursing assistants and nurses can only

devote a few minutes to each resident. Indeed, residents oftentimes receive no

assistance and thus only eat and drink whatever small amount of food and fluid

they are able to feed to themselves.

103.   The Defendant Managers' and the Defendant Facilities' disregard for

bed-confined residents' dietary and hydration needs caused and continues to cause

the residents to experience significant weight loss, dehydration, weakened immune

systems (increasing the risk of infections), increased bed sores, poor wound

healing, weakened muscles and bones (which can lead to fractures), and an overall

increased risk of morbidity and death. Illustrating the magnitude of this form of

abuse, Relator estimates that approximately 25% of Imperial's residents suffer from severe malnutrition and dehydration.

### *Toileting*

104.   A significant percentage of the Defendant Facilities' residents are either (a) incontinent and require adult diapers, (b) bedfast and therefore require assistance with using a bedpan, or (c) mobile but need assistance getting to and from the bathroom. The Defendant Facilities are obligated by Federal and Michigan law to ensure that residents are able to properly perform the basic function of toileting. (*See* 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. §§ 483.24(a)(2), 483.24(b)(3) & 483.25(g); Mich. Admin Code R. 325.20707(4)). Customarily, nursing assistants are responsible for assisting residents with toileting, including changing diapers, providing bed pans, or accessing the commode.

105.   Due to the severe understaffing of nursing personnel at the Defendant Facilities, the bed-confined residents' calls for toileting assistance either go unanswered or are not responded to quickly enough. Bed-confined residents who are unable to speak or are so physically impaired that they cannot call for assistance with toileting are likewise ignored for substantial periods of time. Consequently, these residents are forced to regularly urinate and defecate in their beds. The residents then often lie in their urine and feces for hours, until a nursing

assistant has time to clean them and change their bedding, which, as described in more detail below, often only results in a marginal improvement. On certain days, a resident may only be assisted with a bedpan once, leaving them with no other option but to urinate and defecate in their beds. Similarly, residents who need to wear an adult diaper often must wait extended periods before their soiled and/or soaked diaper is changed. Not only is this cruel, degrading, and inhumane, but lying in feces and/or urine for prolonged periods creates a dangerous health hazard. Laying in bodily excretions of urine and feces for hours inflames, irritates, weakens, and damages skin. Fecal bacteria can also penetrate the skin and lead to infections, including sepsis and urinary tract infections. Moreover, the bacteria in the feces can cause bedsores to be become infected.

106.   Many residents who are able to use a toilet require assistance with getting to and from the bathroom and/or getting on and off the toilet. Residents who require assistance using a toilet often request help using the nurse call button/light. However, due to the gross understaffing at the Defendant Facilities, nursing personnel are usually unable to respond to nursing calls for a significant length of time and, indeed, often do not respond at all. Unable to wait, residents risk injury by walking themselves to the bathroom, adjusting their clothing, and getting on and off the toilet. Several residents have relieved themselves in their

clothes, fallen, and/or been forced to wait for help getting off the toilet for

extended periods due to the severe staffing shortages at the Defendant Facilities.

### *Soiled Sheets/Soaked Mattresses*

107.   When bedding becomes wet or soiled nursing facilities are required to

change the bedding immediately. (*See* Mich. Admin. Code R. 325.20711(3)(c) &

325.20707(4)). As explained above, bed-confined residents at the Defendant

Facilities regularly have no choice but to defecate and urinate in their beds due to

inadequate nursing personnel staffing. Because the nursing personnel at the

Defendant Facilities are severely understaffed and overwhelmed, residents

regularly lie in wet and soiled sheets for extended lengths of time—often several

hours—before the sheets are finally changed.

108.   Moreover, many of the mattresses at the Defendant Facilities do not

have plastic covers, which violates Mich. Admin. Code R. 325.20711(1)(a). And

because these mattresses have been repeatedly soiled and urinated upon, they are

perpetually saturated with urine and feces, creating a health hazard to the residents.

Consequently, as soon as clean sheets are placed on the mattresses, the clean sheets

become wet and tainted with bodily excretions, and the residents rarely enjoy a dry

and clean bed.

### *Bathing*

109.   Michigan mandates that bed-confined residents be bathed at least twice per week and partially bathed daily as required due to secretions, excretions, or odors. (*See* Mich. Admin Code R. 325.20707(4)(f)). Nursing assistants are normally responsible for bathing residents. If a resident is immobile, two to three nursing assistants are required to lift and shower the resident.

110.   The Defendant Facilities, under the direction and control of the Defendant Managers, routinely ignore Michigan's bathing requirement and disregard residents' well-being by providing bedridden residents with a bath or shower just once or twice per month. Residents who are not bedridden but still need assistance with showering, typically receive just one shower per week. Additionally, the Defendant Facilities do not provide residents daily partial baths. By not providing residents required bathing services, residents are not only unclean and odorous, they are also at a significantly increased risk of skin damage, bedsores, and infections.

111.   Once again, the Defendant Managers' and the Defendant Facilities' desire to increase profits by keeping nursing personnel headcount dangerously low lies at the root of inadequate resident cleanliness.

### *Decubitus Ulcers*

112.   A large percentage of the residents at the Defendant Facilities suffer

from decubitus ulcers (a/k/a bedsores or pressure ulcers), nearly all of which

developed after the residents were admitted to the Defendant Facilities. As

explained above, many residents are not repositioned at appropriate intervals, are

forced to lie in wet and soiled adult diapers and/or wet and soiled sheets for

extended periods, are not receiving essential nutrition and hydration, and are rarely

bathed. The combination of these factors contributes to an abnormally high rate of

decubitus ulcers among the residents of the Defendant Facilities. At Imperial, for

example, approximately half of the long-term care and skilled nursing residents

have bedsores that the Relator attributes to the consequences of woefully

inadequate staffing.

113.   Making matters worse for the residents, the Defendant Facilities,

under the direction of the Defendant Managers, also understaff wound care nurses

to save on labor costs. Imperial, for instance, only employs two wound care nurses,

each of whom work one eight-hour shift. Two wound care nurses are unable to

provide the daily care—such as cleaning wounds, changing dressings, removing

damaged or infected tissue, and providing topical or oral antibiotics to fight

infections—that each patient with bed sores requires and that has been ordered by a

physician. Accordingly, although most bedsores can be successfully treated, at the

Defendant Facilities residents' bedsores usually rapidly worsen and become infected, prolonging patients' pain and discomfort and increasing their risk of morbidity and mortality.

### *Sepsis*

114.   Sepsis is a serious medical condition that arises when the body produces an overwhelming immune response to infection and the body's immune chemicals are released into the blood to combat the infection. The immune chemicals trigger widespread inflammation, which often leads to blood clots and leaky blood vessels. When this happens, blood flow is impaired and organs are deprived of nutrients and oxygen, resulting in organ damage. In severe cases, one or more organs fail. And in the worst cases, sepsis leads to a drop in blood pressure, which weakens the heart and causes the patient to go into septic shock. Once in septic shock, the patients' lungs, kidneys, and/or liver may quickly fail, and the patients can die. Individuals diagnosed with sepsis typically require admission to a hospital intensive care unit, where doctors will try to stop the infection, protect the vital organs, and prevent a drop in blood pressure. Patients who are severely affected might require a breathing tube, kidney dialysis, or surgery to remove the infection.

115.   The incidence of sepsis among residents of the Defendant Facilities is abnormally high, a fact that the Relator attributes to understaffing of nursing

personnel and the prevalence of wound infections at the Defendant Facilities,

which as explained above, frequently are not properly treated. Multiple residents

have gone into septic shock and died. Relator estimates that 20% of Imperial's

resident population have contracted sepsis while residing at the facility, and 25%

of those residents' condition worsened to the point of septic shock. Here again, the

lack of sufficient nursing personnel is the primary cause of the high rate of sepsis

among residents of the Defendant Facilities.

116.   Notably, under the Defendant Facilities' internal policy, instituted by

the Defendant Managers, nurses are instructed that when he or she believes a

resident may be septic, they should report their concern to the facility's DON, who

will then decide whether the resident can be treated at the facility or sent to a

hospital. The Defendant Facilities, under the direction of the Defendant Managers,

instruct the directors of nursing to do everything they can to avoid having a

resident transferred to a hospital for sepsis treatment because the nursing facilities

will not be paid for days that the resident is at the hospital and away from the

facility. The directors of nursing report sepsis cases to the resident's physician,

requesting that the physician approve of the facility treating the resident's

infection. Because the directors of nursing do not disclose the severity of the

resident's condition, and the physicians normally do not examine the resident, such

requests are typically approved. And because of the inadequate nursing personnel

staffing at the Defendant Facilities, residents usually receive inferior treatment and the sepsis oftentimes worsens. Concerned nurses have bypassed the DON and called for ambulances in order to get septic residents urgently needed hospital care. The Defendant Facilities reprimanded these nurses for sending the septic residents to a hospital without the DON's prior approval.

### *Dental Hygiene*

117.   Michigan and Federal law require that nursing facilities provide services to ensure residents maintain appropriate oral health. (*See* 42 U.S.C. § 1396r(b)(4)(A)(vi); 42 C.F.R. §§ 483.24(a)(2) & (b); Mich. Admin. Code R. 325.20707(4)(b) & (g)). The Defendant Managers and the Defendant Facilities ignore this requirement. Residents who are unable to brush their teeth rarely receive assistance. The lack of proper oral hygiene over an extended period can lead to tooth loss, pain and discomfort, and a substantial increased risk of illness and infection among residents.

118.   Since at least January 2013, the Defendant Facilities and the Defendant Managers have deliberately understaffed nursing personnel to save on costs, depriving residents of other services and care that would enable them to "attain or maintain the highest practicable physical, mental and psychosocial well-being," even social work and routine physical, occupational, and speech therapy (including swallowing tests).

47

119.    Due to the severe understaffing of nursing personnel residents at the Defendant Facilities commonly experience additional types of physical and emotional harm, including, among other harms:

(a)    As a result of not receiving bathing and grooming services, having unclean bedding, and not receiving appropriate skin care, multiple residents have become infested with scabies (human itch mite);

(b)    The uncleanliness of the residents, their beds, and their rooms has resulted in residents regularly experiencing staph infections, pneumonia, influenza, and urinary tract infections;

(c)    Because the Defendant Facilities have been slow to respond to scabies outbreaks, infections, and viruses and have failed to act quickly to contain these contagious infections by quarantining affected residents and decontaminating rooms, supplies, and equipment, the scabies outbreaks, infections, and viruses frequently spread to and harm other residents;

(d)    Residents are forced to endure excessive wait times, often over an hour, before nurses respond to their calls for help;

(e)    The lack of supervision and poor living conditions has led to fighting among residents; and

(f)    The lack of supervision and poor living conditions has enabled residents to wander unaccompanied from the facilities.

48

120.   When residents do not receive a required service, the Defendant Facilities nevertheless often falsely indicate in the residents' medical records that the service had been provided. The Defendant Facilities change the dates to make it appear that services that were not provided in a timely fashion, or not provided at all, were compliantly furnished to residents on a timely basis. As part of this effort to conceal the Defendant Facilities' fraud and abuse, the DON instructs LPNs to review residents' medical records and alter chart entries to make them appear as though the residents received all of the required services.

121.   The Defendant Facilities, under the Defendant Managers' direction, similarly do not employ adequate housekeeping staffs. As a result, most residents' rooms are unsanitary, disorderly, and odorous, contributing to the high rate of infections and viruses among residents, not to mention substantial emotional harm. The rooms at the Defendant Facilities are not the clean, safe, and comfortable environments that are required and for which the government health care programs are paying.

**B.    The Defendant Facilities Do Not Employ Enough Nursing Personnel to Provide the Services and Care that Michigan and the Federal Government Require and Are Paying Them to Provide**

122.   As providers of nursing home services and care to beneficiaries of Michigan Medicaid and Medicare, Federal law mandates that the Defendant Facilities have sufficient nursing personnel to:

49

- "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident" (42 U.S.C. § 1396r(b)(1)(A));

- "[provide each resident] the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care" (42 C.F.R. § 483.24);

- "provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population …" (42 C.F.R. § 483.35); and

- "ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices" (42 C.F.R. § 483.25).

123. Similarly, Michigan law requires that the Defendant Facilities maintain a staff of nursing personnel that is able to satisfy the care needs of each resident and to at all times meet the staffing requirements specified in M.C.L. § 333.21720a. Michigan further requires that nursing facilities ensure that residents "receive preventive, supportive, maintenance, habilitative, and rehabilitative nursing care directed to the physiologic and psychosocial needs and well-being of that patient." (Mich. Admin. Code R. 325.20707(1)). Correspondingly, "nursing facilities must have nursing staff sufficient to provide nursing and other related services to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident." (*See* MDHHS Medicaid Provider

Manual, ch. Nursing Facility, part Nursing Facility Coverages, § 10.21 (Apr. 1, 2019)).

124.   The extent to which the Defendant Managers and the Defendant Facilities flouted Federal and Michigan law by regularly and systematically not providing the fundamental nursing home services referenced above is demonstrated by the grossly inadequate level of nursing personnel employed by the Defendant Facilities.

125.   On most days since January 2013, the staffing levels for nursing personnel at the Defendant Facilities during each shift—day, afternoon, and midnight—have been materially below the levels required under Federal and Michigan law.

126.   As explained in paragraph 70 above, nursing facilities operating in Michigan are required to submit nurse staffing reports to MDHHS at least quarterly. (*See* Mich. Admin. Code R. 325.20704(2)). The Defendant Facilities, under the Defendant Managers' direction, submitted materially inaccurate nurse staffing reports to MDHHS in order to deceive the State into allowing them to maintain their licenses, to be able to continue participating in the Medicaid and Medicare programs, and to receive payments from Medicaid and Medicare for services and care, which as described above were either provided in a severely substandard manner or not furnished at all.

127.    Additionally, as explained in paragraphs 82–83 above, nursing facilities are required to report their costs, including nursing personnel labor costs, to MDHHS and CMS annually. The costs reported are taken into account by the government health care programs in calculating the per diem rates they pay nursing facilities as compensation for providing the set bundle of nursing home services and care to Medicaid and Medicare beneficiaries. On information and belief, the Defendant Facilities, under the direction of the Defendant Managers, inflated their reported nursing personnel costs, rather than reporting the actual amount that they paid for nursing personnel.

128.    Most nursing facilities employ Registered Nurses (RNs), Licensed Practical Nurses (LPNs), and nursing assistants.

129.    RNs and/or LPNs furnish routine daily care to residents, such as monitoring residents' health and taking vital signs, administering medicines, preparing and monitoring IVs, drawing blood, assisting with wound care, inserting and caring for urinary catheters, caring for patients with ventilators and tracheostomy tubes, providing enteral feedings, and assisting with the nursing care plan. RNs and/or LPNs are also responsible for residents' personal hygiene and helping feed residents.

130.    Nursing assistants (or certified nursing assistants ("CNAs")), assist the RNs and LPNs by getting residents out of bed or moving them into more

comfortable positions, bathing residents, changing bed linens, changing bed pans and adult diapers, assisting residents with toileting, feeding residents, helping with personal and oral hygiene, changing clothes and gowns, transporting residents, and assisting residents with other fundamental daily living activities that are designated by the LPN or RN. Nursing assistants are also normally responsible for answering patient call lights.

131.   To reduce labor costs and increase their profits, the Defendant Facilities, under the direction of the Defendant Managers, employ far fewer nursing assistants than are required to provide the services Medicaid and Medicare are paying them to provide to their residents.

132.   Inasmuch as the Defendant Facilities do not employ enough nursing assistants to provide residents with the required services that nursing assistants are typically responsible for performing, the Defendant Managers and the Defendant Facilities effectively force nurses (LPNs and RNs) to perform, in addition to their duties, the services and tasks ordinarily performed by nursing assistants. As a result, the nurses do not have sufficient time to properly furnish, in conformity with State and Federal requirements and standards, the clinical services and care that they are responsible for providing residents.

133.   For example, in flagrant violation of Michigan and Federal law, Unit C of Imperial, a 75-bed, long-term care unit that houses a significant number of

bed-confined residents, regularly does not have enough nursing assistants to even come close to meeting the needs of its residents. To properly meet the significant needs of all of the residents in Unit C, Imperial should have at least seven nursing assistants on the morning shift, at least seven nursing assistants on the afternoon shift, and at least five nursing assistants on the nighttime shift. Yet, on most days there are just two or three nursing assistants covering the unit. Often there is merely one nursing assistant. In addition to having an inadequate number of nursing assistants, frequently the nursing assistants are fatigued because they are working back-to-back eight-hour shifts (for a total of 16 hours of work per day), which further inhibits their ability to provide appropriate care. The drastic understaffing of nursing assistants in turn forces the nurses—usually only two per shift—to perform tasks that would normally be the responsibility of nursing assistants, preventing the nurses from appropriately performing their own essential responsibilities.

134.   That Imperial is not meeting, and is in fact disregarding, the needs of its residents in flagrant violation of the State and Federal minimum staffing requirements is most clearly evidenced by the extremely poor health and hygiene of its residents. Moreover, Imperial's material non-compliance with Michigan's requirements regarding (a) the limitations on the number of residents assigned to each nursing personnel and (b) minimum minutes of care furnished to each

resident further demonstrates that it and the Management Defendants are neglecting the residents and not providing them the level of services for which it is billing the government health care programs and is being paid.

135.   Relator estimates that from 7:30am–3:00pm on a typical day Imperial, for all four units in the facility, only has 20 nursing personnel (nurses, except for the DON, and nursing assistants) working, which is far less than the 31 needed to comply with the legal minimum required under Michigan law (M.C.L. § 333.21720a(2)).[6] From 3:30pm–11:00pm on a typical day, Imperial's nursing personnel staff consists of just 18 nurses and nursing assistants – three fewer than the state-mandated minimum. And from 11:30pm–7:00am Imperial usually only has 16 nursing personnel working, which is one below Michigan's minimum requirement.

|  | Max. No. of Residents Per Nursing Personnel Allowed Under M.C.L. § 333.21720a(2) | Nursing Personnel Required to Satisfy Min. Requirement (Assuming 242 Residents) | Estimated Total Nursing Personnel on a Typical Day | Residents Per Nurse & CNA (Assuming 242 Residents) |
|---|---|---|---|---|
| 7:30am-3:00pm | 8 | 31 | 20 | 12.1 |
| 3:30pm-11:00pm | 12 | 21 | 18 | 13.4 |
| 11:30pm-7:00am | 15 | 17 | 16 | 16.1 |

---

[6]  This analysis assumes Imperial had 242 residents, which is the nursing facility's average census according to Medicare's Nursing Home Compare website (https://www.medicare.gov/nursinghomecompare/search.html). Inasmuch as the low staffing levels at Imperial have been relatively steady, when the census exceeds 242, the negative impact of the understaffing grows even worse.

136.   Likewise, Imperial, on a regular basis, flouts Michigan's requirement that there be sufficient nursing personnel to provide at least 135 minutes (2¼ hours) of care and services to each resident, each day. (*See* M.C.L. § 333.21720a(2)). Based on Imperial's estimated staffing level on a typical day, the nursing personnel staff regularly provide residents significantly less than the minimum amount of time Michigan law requires that each resident receive.[7]

137.   To make matters worse, Imperial's and the other Defendant Facilities' grossly inadequate staff of nursing personnel are highly overworked, further reducing the quality of care that they provide.

138.   Rather than maintaining a sufficient number of nurses and nursing assistants at the Defendant Facilities to properly staff each shift, the Defendant Managers and the Defendant Facilities regularly have nurses and nursing assistants work a second shift or an extra partial shift.

139.   After completing their regular eight-hour shifts, many nursing assistants work a second eight-hour shift. Similarly, nurses occasionally work an additional four hours at the end of their regular 12-hour shift.

140.   Around the end of 2017, Imperial began offering nurses and nursing assistants the option to work overtime, offering $100 cash or gift cards as an

---

[7] Once again, this analysis assumes a census of 242 residents. (*See* footnote 6 above).

inducement. When there were not enough volunteers, Imperial instituted something that it called "mandation," which made it mandatory for nursing personnel working at the facility to work a second shift.[8] If staff failed to comply with the mandatory overtime shift, they were warned by the DON that they would be terminated. The DON also threatened nursing staff that their nursing licenses would be in jeopardy if they failed to work mandatory overtime.

141.   For a few months starting in or around January 2016, rather than giving nursing assistants the option to *volunteer* for overtime, Imperial required that all nursing assistants work 16 hours per day, 5–7 days per week.

142.   After the nursing assistants' union advised the Defendant Facilities that they could not require the nursing assistants to work two shifts per day, the Defendant Facilities returned to labeling a second shift "voluntary."

143.   Having nursing personnel work back-to-back and 16-hour shifts violates Mich. Admin. Code R. 325.20703(4), which prohibits nursing facilities from using a nurse or nursing assistant on the night shift if they worked during the preceding eight hours.[9]

---

[8]  Nursing homes customarily only issue "mandation" when severe weather or some other significant event prevents nursing personnel from safely commuting to the nursing facility.

[9]  Although there is an exception for a staffing emergency, *see* Mich. Admin. Code r. 325.20703(4), the exception does not apply when the staffing emergency is the result of a facility's normal staffing practice, as is the case here.

144.   It bears emphasis that even with nursing personnel working overtime and 16-hour shifts, the nursing personnel staffing level at Imperial is still far below Michigan and Federal staffing requirements and the levels needed to perform the required nursing facility services in conformity with State and Federal standards and requirements.

145.   As a result of working long hours and being responsible for an untenable number of residents, the Defendant Facilities' nursing personnel staffs are constantly fatigued and work under significant duress. Consequently, there is a high level of staff turnover, which impacts residents' continuity and quality of care.

146.   The poor quality of care and inadequate staffing at the Defendant Facilities has led to numerous adverse incidents that the Defendant Facilities were legally required to report to the State and/or MDHHS. Oftentimes, however, the incident reports submitted by the Defendant Facilities are materially misleading and do not reflect the true circumstances that led to the incidents. The directors of nursing intimidate and coerce the nursing staff into minimizing the severity of incidents in their reports and to shift the blame away from the Defendant Facilities and their noncompliant and illegal practices.

147.   When incidents related to inadequate staffing occur, the Defendant Facilities often react by blaming and suspending nursing assistants to make it

appear as though the nursing assistants caused the incidents and that the Defendant

Facilities took decisive action in response. For example, in 2018, Imperial's DON,

Donna Sue Wiatr, suspended a nursing assistant, claiming that she was at fault for

a resident's fall because she operated a transfer machine by herself. Ms. Wiatr,

however, was well aware that the nursing assistant, like other nursing assistants,

was forced to regularly use the transfer machine alone because of Imperial's lack

of adequate staffing.

148.   In or around October 2018, MDHHS cited Imperial for not complying

with Michigan's minimum nursing personnel staffing requirements. Following the

citation, the facility began utilizing contract nursing assistants to boost its staffing

level. Even with the addition of contract CNAs, the staffing levels remained

deficient. However, after approximately two months, Imperial stopped using the

contract nursing assistants to reduce costs and returned to grossly deficient

staffing. Notably, several contract nursing assistants refused to return to Imperial

after witnessing how deficient the staffing levels were and the negative impact that

understaffing was having on the residents.

149.   Imperial has devised a scheme to deceive the government health care

programs into believing that the facility employs more nursing personnel than it

truly does. When a government inspector checks-in at the front desk of the facility,

the receptionist is trained to make an announcement over the facility's public-

address system stating, "Janet Smith please call the front desk." All employees—nurses, nursing assistants, and administrative staff—know that this announcement is a signal alerting them that a government inspector is inside the facility and that employees should immediately stop what they are doing and make themselves appear busy helping residents.

150. Nursing personnel, residents, and residents' families and friends regularly complain to the Defendant Facilities, the Defendant Managers, the unit managers, DON, and other administrators regarding the grossly substandard resident care and conditions at the Defendant Facilities caused by the inadequate staffing. The complaints, however, are ignored.

151. The Defendant Facilities' administrators, DON, and unit managers meet daily to review, among other things, residents' treatment and care needs and staffing. Even though the senior staff of Imperial know that inadequate staffing is the cause of many of the issues and problems discussed during the daily meetings, inadequate nursing personnel staffing levels are not discussed during meetings. Imperial's administrator, Patrice Farmer, instructed the DON and unit managers that they are not to raise or entertain concerns about inadequate nursing personnel staffing levels because the Defendant Managers and the Defendant Facilities will not change their staffing practices.

**C.     Examples of False Claims**

152.   Imperial Resident 1, a Michigan Medicaid beneficiary and long-term care resident for approximately three years, was a victim of grossly inadequate and substandard nursing care that directly or indirectly caused her health to decline significantly. Imperial Resident 1 died in July 2019 from sepsis. She developed the following conditions, among others, while residing at Imperial:

- multiple urinary tract infections
- hypernatremia
- aspiration pneumonia on multiple occasions
- severe protein-calorie malnutrition
- acute renal failure (dehydration and/or sepsis related)
- elbow and hand contracture
- pressure ulcer to sacrococcyx (advanced to Stage 4)
- scabies exposure (necessitating prophylactic treatment)
- sepsis that advanced to septic shock
- significant weight loss

153.   Imperial Resident 2, a Michigan Medicaid beneficiary and long-term care resident for approximately 18 months, is a victim of grossly inadequate and substandard nursing care that directly or indirectly caused her health to decline significantly. Imperial Resident 2 developed the following conditions, among others, while residing at Imperial:

- contracture to upper right extremity
- significant weight loss
- protein-calorie malnutrition
- two wounds to coccyx and right ischial
- scabies exposure (necessitating prophylactic treatment)

61

154.   Imperial Resident 3, a Michigan Medicaid beneficiary and long-term care resident for approximately two years, is a victim of grossly inadequate and substandard nursing care that directly or indirectly caused his health to decline significantly. Imperial Resident 3 developed the following conditions, among others, while residing at Imperial:

- stage 1 pressure ulcer to coccyx
- skin tear to right forearm
- multiple falls from bed and wheelchair
- severe scabies (for over a year)
- severe sepsis advancing to septic shock
- health care associated pneumonia (HCAP)
- hypernatremia
- urinary tract infection
- significant weight loss

Notably, Imperial was slow to quarantine Imperial Resident 3, resulting in the scabies spreading to other residents in the unit.

155.   Imperial Resident 4, a Michigan Medicaid beneficiary and long-term care resident for approximately 6½ years, is a victim of grossly inadequate and substandard nursing care that directly or indirectly caused his health to decline significantly. Imperial Resident 4 developed the following conditions, among others, while residing at Imperial:

- superficial necrotic hard firm ulcer to right plantar foot and right second toe
- pre-gangrene bilateral toes ulceration on left foot
- superficial necrotic soft tissue ulcer to bilateral feet
- below the knee amputation

- pre-ulcerative lesion to right foot
- bacteremia

156.   Imperial Resident 5, a Michigan Medicaid beneficiary and long-term care resident for approximately 9½ years, is a victim of grossly inadequate and substandard nursing care that directly or indirectly caused her health to decline significantly. Imperial Resident 5 developed the following conditions, among others, while residing at Imperial:

- aspiration pneumonia (multiple occasions)
- scabies exposure (necessitating prophylactic treatment)
- multiple urinary tract infections
- dehydration

157.   Bills related to Imperial Residents 1, 2, 3, 4 and 5 and a significant percentage of other residents' bills for nursing home services and care that the Defendant Facilities submitted, and the Defendant Managers caused to be submitted, to the government health care programs since January 2013 were knowingly false because the Defendant Facilities systematically did not provide the required set of nursing home services and care in conformity with Michigan and Federal requirements and standards, and in many cases did not provide the essential services at all.

158.   Because the Defendant Facilities, under the direction of the Defendant Managers, maintained grossly understaffed nursing personnel, the residents did not receive the services at the frequency or level of quality that the government health

care programs require and paid for. Instead of providing residents nursing home services and care in a manner that would enable the residents to "attain or maintain the highest practicable physical, mental and psychosocial well-being," as Medicare and Michigan Medicaid require, the Defendant Managers and the Defendant Facilities have caused and continue to cause residents to suffer serious physical and emotional harm, jeopardizing their health, safety, and welfare.

159.   If the government health care programs had been aware that the Defendant Facilities' claims for payment were false, they would have denied them.

## VI.
## COUNTS

### Count I
### Michigan Medicaid False Claims Act
### M.C.L. § 400.607(1)

160.   Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

161.   By virtue of the acts described above, the Defendant Managers and the Defendant Facilities "ma[de] or present[ed] or cause[d] to be made or presented to an employee or officer of this state a claim under the social welfare act … upon or against the state, knowing the claim to be false" in violation of M.C.L. § 400.607(1). More particularly, the Defendant Facilities have knowingly been presenting, and the Defendant Managers have knowingly caused them to present, claims for payment to Michigan Medicaid for nursing home services and

care that are false because the services and care are so far below the required standards that they are essentially worthless or in many cases were not furnished at all.

162.   Michigan, unaware of the falsity of the claims presented or caused to be presented by the Defendant Managers and the Defendant Facilities, paid and continues to pay the claims.

163.   By reason of the Defendant Managers' and the Defendant Facilities' acts, the Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## Count II
## Michigan Medicaid False Claims Act
## M.C.L. § 400.605(1)

164.   Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

165.   By virtue of the acts described above, the Defendant Managers and the Defendant Facilities "knowingly and wilfully ma[de], or induce[d] or s[ought] to induce the making of, a false statement or false representation of a material fact with respect to the conditions or operation of an institution or facility in order that the institution or facility may qualify, … upon recertification, as a … skilled nursing facility [and/or] intermediate care facility," all in violation of M.C.L. § 400.605(1).

166.   The Defendant Facilities made, and the Defendant Managers caused to be made, the following false statements of material fact, among others, concerning the conditions or operation of the Defendant Facilities that enabled the facilities to qualify as skilled nursing and intermediate care facilities:

(a)   false nurse staffing reports that were submitted to MDHHS quarterly under Mich. Admin. Code R. 325.20704(2); and

(b)   false annual cost reports submitted to MDHHS and Medicare.

167.   The State of Michigan, unaware of the falsity of the statements and representations made, or induced or sought to induce, by the Defendant Managers and the Defendant Facilities, recertified the Defendant Facilities as skilled nursing facilities and/or intermediate care facilities.

168.   By reason of the Defendant Managers' and the Defendant Facilities' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

169.   This is a claim for treble damages and civil penalties against the Defendant Managers and the Defendant Facilities under the Federal FCA, 31 U.S.C. § 3729(a)(1)(A), for knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and/or, pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii), to Michigan Medicaid.

66

170.   Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

171.   The Defendant Facilities and the Defendant Managers have violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented false or fraudulent claims to the Medicare program for payment for required nursing facility care and services that were to be furnished to Medicare beneficiaries but were not provided in conformity with Federal and Michigan requirements.

172.   The Defendant Managers and the Defendant Facilities have also violated 31 U.S.C. § 3729(a)(1)(A) because as part of the alleged fraudulent conduct, the Defendant Facilities and Defendant Managers knowingly presented false or fraudulent claims, or caused false or fraudulent claims to be presented, to Michigan Medicaid for payment for required nursing facility services that were to be furnished to Michigan Medicaid beneficiaries but were not provided in conformity with Federal and Michigan requirements. The Defendant Managers and the Defendant Facilities thereby also caused Michigan Medicaid to submit false claims to the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(A).

173.   The Defendant Managers and the Defendant Facilities likewise violated 31 U.S.C. § 3729(a)(1)(A) because through these acts they knowingly

presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or

fraudulent claims to Michigan Medicaid (a grantee and/or recipient of United

States funds) for payment for required nursing facility services that were to be

furnished to Michigan Medicaid beneficiaries but were not provided in compliance

with Federal and Michigan requirements.

174.   The United States, unaware of the foregoing circumstances and

conduct, and in reliance on the truth and accuracy of the claims for payment, paid

or authorized payment of those claims and has been damaged in an amount to be

proven at trial.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

175.   This is a claim for treble damages and civil penalties against the

Defendant Managers and the Defendant Facilities under the Federal FCA, 31

U.S.C. § 3729(a)(1)(B), for knowingly making, using, or causing to be made or

used, a false record or statement material to false or fraudulent claims paid or

approved by the United States and/or, pursuant to 31 U.S.C. § 3729(b)(2)(A)(ii), to

Michigan Medicaid.

176.   Relator re-alleges and incorporates each allegation in each of the

preceding paragraphs as if fully set forth herein and further alleges as follows:

177. The Defendant Managers and the Defendant Facilities have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to claims for payment paid by the Medicare program for required nursing facility services that were to be furnished to Medicare beneficiaries but were not provided in compliance with Federal and Michigan requirements, including, but not limited to:

(a)   false nurse staffing reports submitted to MDHHS quarterly under Mich. Admin. Code R. 325.20704(2);

(b)   false annual cost reports submitted to MDHHS and Medicare;

(c)   inaccurate incident reports;

(d)   altered and falsified medical records; and

(e)   misleading investigators.

178. The Defendant Managers and the Defendant Facilities also violated 31 U.S.C. § 3729(a)(1)(B) because as part of the alleged fraudulent conduct the Defendant Managers and the Defendant Facilities knowingly made, used, or caused to be made or used, a false record or statement material to false or fraudulent claims paid or approved by Michigan Medicaid. The Defendant Managers and the Defendant Facilities thereby also caused Michigan Medicaid to make or use false records or statements material to false or fraudulent claims paid by the United States for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(1)(B).

69

179.   The Defendant Managers and the Defendant Facilities likewise violated 31 U.S.C. § 3729(a)(1)(B) because through these acts they knowingly presented or caused to be presented, under 31 U.S.C. § 3729(b)(2)(A)(ii), false or fraudulent claims to Michigan Medicaid (a grantee and/or recipient of United States funds) for payment for required nursing facility services that were to be furnished to Michigan Medicaid beneficiaries but were not provided in compliance with Federal and Michigan requirements.

180.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator demands that judgment be entered in favor of the United States and the State of Michigan and against the Defendant Managers and the Defendant Facilities for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This request includes, with respect to Michigan, three times the amount of damages to the State, plus civil penalties of no more than $10,000 and no less than $5,000 for each false claim submitted, and any other recoveries or relief provided for under the Michigan Medicaid FCA. This request also includes, with respect to the United States, three

70

times the amount of damages to the United States, plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim submitted on or before November 2, 2015 and civil penalties of no more than $22,363 and no less than $11,181 for each false claim submitted on or after November 3, 2015, and any other recoveries or relief provided for under the Federal FCA.

Further, Relator requests that it receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by Michigan and the United States plus reasonable expenses necessarily incurred and reasonable attorneys' fees and costs. Relator requests that its award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## **JURY DEMAND**

Relator, on behalf of itself, the United States of America, and the State of Michigan, by and through its attorneys, Cohen Milstein Sellers & Toll PLLC and Hertz Schram PC, hereby demands a jury trial in the above-captioned matter.

DATED: June 27, 2024                Respectfully submitted,

                                    HERTZ SCHRAM PC


                          By: /s/ Matthew J. Turchyn
                              Matthew J. Turchyn (P76482)
                              1760 S. Telegraph Road, Suite 300
                              Bloomfield Hills, MI 48302
                              (248) 335-5000

                              mturchyn@hertzschram.com

                              COHEN MILSTEIN SELLERS & TOLL
                              PLLC
                              Gary L. Azorsky
                              Casey M. Preston
                              1717 Arch Street, Suite 3610
                              Philadelphia, PA 19103
                              (267) 479-5700
                              gazorsky@cohenmilstein.com
                              cpreston@cohenmilstein.com

                              *Attorneys for Plaintiff Relator Detroit*
                              *Integrity Partners*

## CERTIFICATE OF SERVICE

I hereby certify on this 27th day of June, 2024, that I will cause a copy of the above Amended Complaint to be served upon the following counsel by certified mail, return receipt requested:

The Honorable Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

The Honorable Dawn N. Ison
United States Attorney
Eastern District of Michigan
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226

The Honorable Dana Nessel
Attorney General
State of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909

I further certify that I will cause a copy of the above Amended Complaint to be served upon the following counsel by electronic mail:

Kelly Quinn McAuliffe
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
101 W. Main Street, Suite 8000
Norfolk, VA 23510
kelly.q.mcauliffe@usdoj.gov

Leslie Wizner
Assistant United States Attorney
Eastern District of Michigan
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226
leslie.wizner@usdoj.gov

Brendan Maturen
Assistant Attorney General
State of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909
maturenb1@michigan.gov

/s/ Matthew J. Turchan
Hertz Schram PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
mturchyn@hertzschram.com
P76482